*Affirmed in part, vacated in part by Docket No. 2009-245 July 2010*

## STATE OF VERMONT
## ORANGE COUNTY

| | | |
|---|---|---|
| **RANDY OAKLEY and**<br>**JENNIFER OAKLEY** | )<br>)<br>) | **Orange Superior Court**<br>**Docket No. 80-5-05 Oecv** |
| **v.** | )<br>)<br>) | |
| **VICTORY IN JESUS MINISTRIES, INC.)**<br>**And DAVID R. LUND** | )<br>) | |

FILED

JUN 2 5 2009

ORANGE SUPERIOR COURT

### FINDINGS OF FACT AND CONCLUSIONS OF LAW
### Final Hearing on the Merits

A court trial was held on April 20, 2009 and May 14, 2009. Plaintiffs were present and represented by Attorney George Spaneas. Melissa Fenoff was present as representative of Defendant Victory In Jesus Ministries, Inc. Defendant David Lund was present. Both Defendants were represented by Attorney Peter Decato. The court took a view of the premises on May 20, 2009.

Plaintiffs Randy and Jennifer Oakley (hereinafter Oakleys) and Defendant Victory in Jesus Ministries, Inc. (hereinafter VIJ) own abutting parcels of real property in Newbury in Orange County. David Lund is Superintendent of construction projects for VIJ, and lives on a separate parcel he owns opposite the VIJ property.

Plaintiffs seek a declaration of the location of the common boundary between the Oakley and VIJ parcels. They also seek damages for trespass and conversion of logs, and punitive damages. Defendants claim that all their activity on the land occurred on their side of the boundary line they claim, and that Plaintiffs abandoned the logs.

There were numerous discrepancies in the testimony of witnesses concerning many of the events in this case, as well as many instances in which the testimony of various witnesses corroborated that of other witnesses, but was not consistent with other physical or documentary evidence or other witness testimony. Witnesses were not sequestered, and many were present throughout the trial and had the opportunity to hear each other's testimony. Thus, each had the opportunity to conform his or her testimony to that of others. The court has exercised its responsibility in determining the credibility of each witness. Moreover, the court had the opportunity to evaluate the demeanor of various witnesses for all parties as they testified, and also used its evaluation of various non-verbal forms of communication in making its determination as to the credibility of each witness as to each piece of testimony.

1

Based upon the credible evidence, the court makes the following Findings of Fact and Conclusions of Law.

**Findings of Fact**

In 1975, Percy Lund and his wife owned a large parcel of land acquired from his parents on the east side of a road in Newbury now known as Dickey Road but known then as the Fulton School District Road. In 1985, he and his wife subdivided and conveyed a parcel at the south end to his sister Kathleen Paul and her husband James so that they would have a parcel of the family land upon which to build a house. The deed states that it contained 10+/- acres, but a subsequent survey shows it to be 7.75 acres. Percy and his wife retained the land to the north.

The southerly parcel created for Kathleen is now owned by the Plaintiffs, Randy and Jennifer Oakley (hereinafter Oakley parcel). The northerly retained parcel is now owned by VIJ (hereinafter VIJ parcel). David Lund, brother of Percy and Kathleen, owns land across Dickey Road from VIJ, and is both the Superintendent of projects for VIJ and one of its ministers. VIJ is a Christian church organized as a 501(c )(3) not-for-profit corporation that has several ministers and engages in many charitable activities, some of which take place on its property on Dickey Road.

When the Oakley parcel was created, Percy, Kathleen, and Kathleen's husband placed 4 pipes in the ground, one at each corner, marking the boundaries. There is no dispute as to the location of the SW, SE, or NE corners of the Oakley parcel (the NE corner marks the common boundary at the back). The NW corner marks the boundary where it meets Dickey Road, and its location is disputed in this suit, as well as the location of the common boundary line running from the NW (disputed) corner to the NE (undisputed) corner.

The description in the 1985 deed creating the parcel is as follows:

Commencing at an iron pipe located at the Southwesterly corner of the premises and proceeding North a distance of 400 feet, more or less, along the Fulton District School Road, to an iron pipe located at the Northwesterly corner of the premises; thence turning to the right and proceeding a distance of 750 feet, more or less, along premises of Percy O. Lund and Judith L. Lund, to an iron pipe located at the Northeasterly corner of the premises; thence turning to the right and prceeding (sic) Southeasterly along a barbed wire fence and premises nor or formerly of Orville Tucker to an iron pipe; thence turning to the right and proceeding along a barbed wire fence and a stone fence also along premises now or formerly of Orville Tucker, to an iron pipe and the point of beginning.

At the time this parcel was created, just north of it, at the southern end of Percy's (now VIJ'S parcel), was a farm road leading from Dickey Road into the Percy/VIJ parcel, which was then used as a hayfield. It angled in to the field from the road. Directly opposite the lane, on the other side of Dickey Road, was a driveway leading to a residence across Dickey Road. This

2

driveway was also at an angle, such that if one were leaving the residence across the road, one would drive across Dickey Road and continue onto the farm road on the Percy/VIJ parcel on a course that was a straight line. Both driveways, showing the way they line up, are visible on an aerial map from 1998 admitted into evidence. In 1998, the layout of the farm road and driveway were the same as at the time of the subdivision in 1985.

In 1990, Percy was getting ready to sell the northern lot to VIJ, and he made a drawing of it. In this drawing, he depicted pipes at other corners, but not at the southwest corner, which was the NW corner of the parcel conveyed to Kathleen (hereinafter the "disputed NW corner"). This is surprising, as it would have been the key marker of the boundary between the parcel being sold to VIJ and Kathleen's parcel to the south. Moreover, the court saw the pipe at the SW corner on its view, and the pipe was a substantial piece of plumbing pipe, hollow in the center, and not just a metal pin. It is a reasonable inference that the pipe originally placed at the disputed NW corner was of the same type. Based on the evidence, the court finds that the pipe originally placed at the NW corner was no longer located in the ground in 1990 when Percy drew the map.

Percy sold his parcel to VIJ in May of 1990. The same year, David Lund purchased his property directly opposite Dickey Road. He had been active in VIJ since 1981. VIJ has, since 1990, made considerable changes to the property as a whole, including developing ponds used for its charitable recreational purposes, and constructing a barn in 1999. VIJ also built up the area around the disputed NW corner of the Oakley piece and along the VIJ-Oakley boundary by adding substantial amounts of fill and reshaping the land near the common boundary, and shifting the location of the farm road, which became a driveway. The driveway on the VIJ property is no longer opposite the driveway leading to the residence across Dickey Road, and its course is different so that it no longer lines up with the opposite driveway in a continuous course.

In 2003, the Oakleys bought their parcel. (There had been intervening owners between Kathleen and their grantor.) David Lund, who lived down the road, opposite the VIJ land, introduced himself. There was a substantial mud buildup around the Oakleys' house, and Mr. Lund offered to remove it for them. Mr. Oakley said that they did not have enough money to pay for such work, but Mr. Lund indicated payment was not necessary. Mr. Lund and his son-in-law, Andrew Lea, came with a bulldozer and excavator and took five truckloads of mud from around the Oakleys' house, spread it on VIJ property, and raked the Oakley surface. The Oakleys were not asked to pay anything. The Oakleys and the Lund family became friendly, and the Oakleys' horse was kept at the Lunds.

In March of 2004, Mr. Oakley was cutting trees with a chainsaw toward the southern end of the Oakley parcel to make a clearing for a paddock for their horse. Mr. Lund came over, and offered that he and members of his group could lend a hand. Mr. Oakley said that he did not have money for the equipment cost. Mr. Lund said that, "we're just good Christian neighbors," and the following Saturday, Andrew Lea, Ted Tucker, and others from VIJ came to help. Over 2 ½ days, about 35-40 trees were cut and the stumps cleared away for an open field. Although some clearing in that area had been done previously, there was substantial tree clearing work that was done by VIJ members under Mr. Lund's direction without cost to the Oakleys. Mr. Lund ran an excavator, and dragged trees into a pile and pulled out stumps. Of the trees that were cut,

3

approximately half were hardwood and were later cut up for firewood by the Oakleys. The other half was softwood. Mr. Lund had a small sawmill on his property and he offered Mr. Oakley the use of it to cut the logs for his own use. Accordingly, the people doing the work took the logs and piled them on the Lund property near the barn. Mr. Oakley paid to fill the diesel gas tank that was used for fuel for the equipment brought by Mr. Lund and his group. Otherwise, there was no compensation paid and no request for payment.

In June, two months later, Mr. Oakley and Mr. Lund walked on the Oakley land together and had a discussion about how the pond on the Oakley property could be improved. Its water was muddy. The Oakley property is swampy and wet, as is the VIJ property that Mr. Lund had managed since 1990. Mr. Lund suggested that the way to get a flow of clean water to the pond was to dig a trench to the pond and fill the trench with crushed stone. He offered to help Mr. Oakley with the project, and they agreed upon the plan. Mr. Lund said that the best time to do this work would be in the late fall. At this point, their relations were still friendly.

In late May and early June, there was some communication between Mr. Oakley and Ted Tucker, a VIJ member who was to help Mr. Oakley saw the logs at the mill, about getting together to saw the logs, but this did not happen, and the plan was overtaken by other events.

During June and July of the same year, 2004, VIJ was doing some water management work of its own, as approved by the members at a VIJ meeting. Runoff water from uphill was washing out the back of its dam near the Oakley land. VIJ decided to create a water retention pond and turn the water into that so it would not wash out the dam. VIJ contracted with First Construction to do the work. First Construction allowed VIJ to save money by operating the First Construction equipment with its own operator. Andrew Lea, Mr. Lund's son-in-law, operated the equipment. He was a member of VIJ and also an employee of First Construction, a corporation providing heavy equipment services that had been organized in January of 2004 by two VIJ members. Some drainage and water management work was done on VIJ land.

As part of the project, Andrew Lea used First Construction equipment to cut a trench several feet wide to direct water from uphill to the retention pond on VIJ land. Some of the trench was on Oakley land. Mr. Lund and other VIJ members testified that the trench was entirely on VIJ land, and that to the extent water flowed across Oakley land toward the trench, it was along the path of an old logging road. The court finds this testimony not credible. The court viewed the historic aerial photographs and the recent photographs in evidence and took its own view on site. The court finds that the water is directed to flow through a deliberately dug trench and that the trench is clearly located in significant part on the Oakley property, as well as on VIJ land. While a portion of it may overlap with an old logging road, the trench as a whole is a trench, and not an old logging road. The length of the trench on Oakley land is over 100 feet. Although there is a dispute about the exact distance, even Mr. Bell, VIJ's surveyor (see below) testified that 11-12 feet of the trench is on Oakley property. At the time this work was done, the Oakleys had no knowledge of it, and had not given any consent.

Later, VIJ did more work on its ponds and water system. VIJ had an excavator make a cut in the dug trench and directed water at a 90 ° angle downhill from the trench toward Dickey Road roughly along the course of the VIJ-Oakley common boundary. The area is wooded, and it

4

is difficult to tell exactly where this water channel runs in relation to either the Marsh or Bell versions of the location of the common boundary (see below). However, at least a part of it is on the Oakley side, even according to the Bell survey, and it is clear that the flow of water has cut a channel up to 3 feet wide that has resulted in erosion of soil out from under trees, causing many trees to fall in toward the channel. Some of this effect from this channel is definitely on the Oakley property.

In addition, VIJ installed a 4" pipe from one of its retention ponds out through a bank. This pipe is located on VIJ land but it points directly toward the Oakley parcel, and sends water to join the channel that crosses into the Oakley property.

As an effect from one or both of these changes to the water flow in the area, a new drainage stream, that did not previously exist, now flows across the Oakley land. It starts from the channel running downhill along the boundary. Partway toward Dickey Road, but before the point at which a small stream has traditionally run along Dickey Road through both the VIJ and Oakley properties, it angles toward the interior of the Oakley property to a point where it joins the traditional stream on the Oakley property.

Mr. Lund testified that all work that was done by VIJ was done on VIJ land. The court finds that the physical evidence on the ground shows otherwise: a portion of the trench dug by VIJ is clearly on the Oakley property, even under the Bell survey. While all of the other work done by VIJ may have been done on VIJ property, the work substantially changed the natural flow of water in the area, and created a new channel and stream of water that flows across the Oakley property at a new location, as well as erosion damage to trees.

In mid-July of 2004, the Oakleys' pond was unusually low. Mr. Lund's grandson was playing at the Oakley house at a time when Mr. Oakley commented on the condition of the pond, and the grandson said, "I hope it's nothing Pa did." Mr. Oakley went to the back part of his property, and discovered the trench. He called Mr. Lund, who came over for a discussion, which was not pleasant. Mr. Oakley asked him why he was building an interstate on the Oakley back land; Mr. Lund told him that he did not own as much land as he thought he did. This raised the issue of the location of the common boundary. They discovered that they disagreed about where the common boundary was, specifically the NW corner of the Oakley piece and the boundary from it to the NE corner. Although the 1985 deed described an iron pipe as a monument marking the NW corner, there was no iron pipe visible. Four hundred feet north of the undisputed SW corner was a spot where VIJ had previously considerably increased the height of the land by a great deal of fill.

The disputed NW corner and boundary became a matter of conflict between members of VIJ and the Oakleys, and much activity. Both sides took active steps to lay claim to where each thought the boundary was. VIJ brought a bulldozer, owned by First Construction, to the site, and spread dirt near the disputed NW corner. Mr. Oakley put a marker in where he believed the corner to be, which was well within the land VIJ claimed, and on the area previously substantially filled in by VIJ. It was gone the next day, and he replaced it with a 4' stake. This led to two encounters on a single day in July between Mr. Lund and various VIJ members on the one hand and Mr. Oakley on the other. Vaughn Salls, then President of VIJ, called his wife

Kathleen (formerly Kathleen Paul) and asked her to come to the site. VIJ members testified at trial that she pointed out where the corner was, and a couple of them dug down and located a buried pin. They claim that they showed it to Mr. Oakley, who at first acquiesced and then got mad and tore it out of the ground and threw it in the woods and claimed that VIJ people had planted it there. Mr. Oakley testified that this incident did not happen. VIJ members further testified at trial that during a second conversation later in the day, Mr. Oakley was drunk and chased Mr. Lund up the road and tried to punch him, or shouted at him and called him an "old man." Mr. Oakley testified that this did not happen. The court finds that there were heated words during these encounters, but that Mr. Oakley was not drunk, and did not try to punch Mr. Lund.

Vaughn Salls, then President of VIJ, and Mr. Oakley agreed that the Oakleys would obtain a survey to show the boundary location, and that both parties would abide by it.

Given the claims in the case, it is not necessary for the court to determine whether or not all details of the encounters occurred as claimed. Having given considerable attention to determining the credibility of each witness, the physical evidence, corroborating evidence or lack thereof, the court finds that whatever VIJ members dug out of the ground, if anything, in July of 2004, it was not the original pipe that was the monument that marked the corner in 1985. For one thing, the ground level in 2004 was considerably higher at the relevant spot than it had been in 1985, due to the addition of large amounts of fill that had been added. Furthermore, the testimony was that a pin was found, not a pipe. The 1985 pipe at the SW corner is a substantial piece of piping, not a pin at all. If Mr. Oakley pulled out a pin in July of 2004 and threw it in the woods, it is incredible that no one sought to retrieve it from the woods to compare it with the pipes at the undisputed corners, as it was such a substantial piece of evidence on such a critical issue in dispute.

In any event, the court finds that there was, in 2004, no piece of pipe as described in the 1985 deed set in the ground in the vicinity of the NW disputed corner. Furthermore, whether Mr. Oakley followed Mr. Lund up the road speaking in an aggressive manner, as is likely, or chased him hollering threats to beat him up, according to some testimony at trial, is not a matter the court is required to decide, as there is no claim that hangs on a determination of fact related to that incident.

Following this incident in July, both parties continued to take action in reliance on their respective positions on the location of the boundary line. VIJ brought in an excavator and pulled a lot of debris out of the ground from an old dump at the location of the NW corner. Mr. Oakley put up the beginning of a stone wall where he believed the corner to be based on the 400 foot measurement in the 1985 deed. Andrew Lea operated an excavator, and under Mr. Lund's supervision and direction, knocked down and removed the stone wall and, with other VIJ members present, erected a fence where VIJ claimed the boundary was.

In the fall of 2004, the Oakleys had a survey prepared by licensed surveyor Harold N. Marsh, who prepared a survey plan locating the NW corner in reliance on the 400 foot distance in the 1985 deed. Mr. Marsh was deceased by the time of trial. Surveyor Thomas Otterman testified as an expert that in the absence of finding the pipe in the ground as a monument, the 400

foot distance was properly relied upon to determine the location of the NW corner. This suit was filed by the Oakleys in May of 2005.

In July of 2006, VIJ had a plan of its property prepared by licensed surveyor Richard W. Bell in conjunction with an Act 250 permit it needed to do work in wetlands. He visited the property with David Lund and relied on affidavits of Percy Lund and Kathleen Salls (formerly Kathleen Paul and now married to VIJ former President Vaughn Salls), given to him stating that the pipe marking the NW corner had previously been at the spot that VIJ claims. He never spoke with either Percy Lund or Kathleen Salls. In reliance on the affidavits, he marked the common boundary at the NW corner of the Oakley property where the VIJ members say it is. According to his drawing, the length of frontage of the Oakley property along Dickey Road is almost 40 feet short of 400 feet. Mr. Bell saw remnants of orange or red paint on the ground at the spot pointed out by Mr. Lund. Vaughn Salls had marked the spot where Kathleen Salls said the corner had been with orange paint. This was done after the dispute developed.

Surveyor Otterman's opinion is that the difference of nearly 40' over a 400' distance is not an acceptable discrepancy (even from 400' "more or less") as the first course along a straight road, and that even if the distance had been originally measured with a 100 foot tape measure dragged four times, the distance would be much closer than nearly 40' off. He also noted that the distance discrepancy on the north line between the deed (750') and the Marsh survey (725') shows a much smaller variance over a much greater distance, further calling into question the accuracy of the VIJ claim of the location of the NW corner.

Mr. Bell also testified that in the absence of the pipe, if he had not been given information about where it was formerly located, the proper method for a surveyor to determine the location of the NW corner would be to measure 400 feet from the SW corner. The reason he did not do that in this case was the affidavits he had been giving purporting to locate the former location of the pipe.

The court, on its view, walked up the driveway opposite Dickey Road and looked straight across Dickey Road, visually following the course of the farm road that used to lead into the hayfield on VIJ land. From this evidence and the 1990 drawing of Percy Lund and the 1998 aerial photos, the court finds it highly unlikely that the iron pipe was located where VIJ says it was, and much more likely that it was located at a spot 400 feet north of the SW corner.

VIJ has not met its burden to show that the original monument at the NW corner, an iron pipe, was located where members told Mr. Bell it was. In the absence of such proof, the Marsh survey more accurately depicts the location of the NW corner, and therefore the common boundary between the properties.

As this dispute was ongoing, there was a great deal of tension between the Oakleys and VIJ members, who turned their backs on the Oakleys. There are several accusations of improper conduct on both sides. Mr. Lund testified that Mr. Oakley fired a shotgun at the roof of his barn. There were no specific facts, and no more than a general allegation. The court does not find this allegation credible. Mr. Lund testified that Mr. Oakley held a gun to Percy Lund. The court does not find this allegation credible.

The Oakleys never asked for their logs back, and Mr. Lund never made them available. Mr. Lund eventually authorized VIJ members to cut them up for firewood and/or burn them in a bonfire. Mr. Lund offered, at one point during the dispute, to sell them back to the Oakleys for $2,000. Mr. Lund's testimony at trial that the value of the logs was only a few dollars is not credible. He went to great lengths, including making a special video to show at the trial, to minimize the logs as having no value for cutting into boards, and therefore having no value. The court rejects this evidence. The only other evidence of value is Mr. Lund's own offer to sell the logs to the Oakleys for $2,000.

Some time in 2006 or 2007, members of VIJ dumped sheep manure on the Oakley property. At various times, the Oakleys took video footage of VIJ activities in the vicinity of the disputed corner. Percy Lund testified that in 2007, he saw Mr. Oakley in his truck, stopped on Dickey Road in front of David Lund's house, stick a gun out the truck window and point it. There is considerable dispute over whether this happened, or could have been observed, or whether a cell phone rather than a gun was held out the window, or whether anything occurred. In any case, Mr. Percy Lund contacted the Vermont State Police, who talked with Mr. Oakley.

Mr. Oakley has had occasion to hire bulldozers and excavators to do earthmoving work in connection with an annual 4-wheel drive "Vermonster" truck rally event that he runs, that requires a considerable amount of reshaping the ground to create courses for the vehicles. He estimates that the cost of equipment to repair the trench would be $8,000, based on the cost of rental of the equipment. Mr. Oakley testified that the cost of a bulldozer is between $80-150 per hour. Nicole Fenoff, who is an owner of First Construction and lives at the David Lund residence, testified that First Construction charged $150 per hour for its bulldozer and $175 per hour for its excavator. Mr. Oakley and Ms. Fenoff's figures are not inconsistent, and establish a reliable range for hourly cost. The court finds both the hourly rate and the number of hours used as the basis for the estimate to be reasonable.

Mr. Oakley testified that it would take "countless hours" to remove the trees downed by the erosion, but he was not more specific. There is no credible evidence of the cost of restoration of the property related to the effects of the new channels and downed trees.

Mr. Oakley estimated that the total cost of restoring all VIJ effects on the Oakley parcel is $60,000-80,000, but he gave no more than this general ball-park estimate. There were no specifics about what he based it on. He testified that the work would have to be done in accordance with wetlands regulations of the Army Corps of Engineers. Although there was contradictory testimony, neither party placed in evidence any reliable information about whether such work would fall within Army Corps regulations, or what would be required.

Mr. Oakley opined that the reduction in value of the Oakley property caused by the VIJ trench and channel effects is $25,000-$40,000. He did not have specific facts to support this opinion. The Court finds that the effects of the VIJ diversion of water onto the Oakley property reduces the value of the property, but that Mr. Oakley has probably overstated the effect. The Court finds that the reduction in value is $5,000.00, which is a portion of the low end of Mr. Oakley's estimate.

8

**Conclusions of Law**

1. <u>Declaration of Boundary.</u> As the Findings of Fact show, the iron pipe that was the monument referenced in the 1985 deed marking the NW corner of the Oakley parcel is missing, and VIJ's testimony that it was previously located where VIJ claims is not credible. All surveyors agreed that in the absence of evidence of where that pipe was previously located, Mr. Marsh's survey, showing the NW corner at a location 400 feet north of the SW corner, as described in the deed, represents correct surveying procedure as a matter of law. Courses and distances may govern the location of property boundaries where the existence of or location of monuments referred to in the deed are not proved. *Thomas v. Olds,* 150 Vt. 634 (1988). Therefore, the boundary between the Oakley and VIJ parcels is as set forth on the Marsh survey.

2. <u>Trespass.</u> There are several forms of trespass claimed.

   A. *Disputed NW corner.* The evidence shows that any encroachment by VIJ that took place after the Oakleys purchased their lot took place after the boundary dispute was discovered, when both sides were physically asserting their view of the boundary. The dispute was a valid one, in view of the fact that the iron pipe boundary marker was missing, and prior owners of the Oakley piece had apparently never disputed VIJ's activities at that location, including the addition of substantial amounts of fill. Thus, the Oakleys have no basis for any more than nominal damages for trespass in this area, and no claim for restoration. The Oakleys are awarded One Dollar in nominal damages against VIJ. There is no basis for a trespass claim against David Lund individually on this claim, as all conduct of his took place in his capacity as Superintendent of projects for VIJ, and not in his personal capacity.

   B. *Trench.* The Oakleys have proved trespass against VIJ for having invaded the Oakley property without permission and dug a trench on the property without having obtained the Oakleys' consent. The action was authorized by VIJ at a corporate meeting, and Andrew Lea was authorized to do the work on behalf of VIJ. The credible evidence establishes that the equipment cost to restore this portion of the Oakley property to its previous condition is $8,000. Therefore, Plaintiffs are awarded compensatory damages from VIJ in the amount of $8,000. There is no basis for a claim against David Lund in his individual capacity, as his conduct on this matter took place in his capacity as Superintendent of projects for VIJ.

   C. *Water Flow.* The Oakleys have proved by a preponderance of the evidence that VIJ's conduct in cutting a turn in the trench to direct water flow down a new channel along the VIJ-Oakley boundary, and placing a 4" pipe that directs water toward the Oakley property, resulted in an artificial disruption of natural water flow that caused unnatural water channels to run across the Oakley property in two locations: from the trench down the boundary, and

9

from the boundary along a new course to the interior of the property where it joined the natural preexisting stream. In addition, the water flow caused damage to the Oakley property by eroding soil out from under the root systems of trees, causing them to fall. Landowners are entitled to claim damages for such conduct. *Powers v. Judd,* 150 Vt. 290 (1988). Plaintiffs have proved liability on their claim against VIJ. There is no basis for such a claim against David Lund in his individual capacity, as his activities in directing this work were done in his capacity as Superintendent for VIJ. As to damages, the evidence of cost of repair was inconclusive. The Findings of Fact support a damages award against VIJ in the amount of $5,000.00, attributable to loss of property value.

3. Conversion. The Oakleys proved that Mr. Lund individually kept logs that he knew belonged to the Oakleys and disposed of them as if they were his own, and have proved the value of the logs at $2,000. Therefore, they are entitled to damages from Mr. Lund in that amount. There is no basis for recovery from VIJ on this claim. The claim for treble damages under 13 V.S.A. § 3606 is denied. The logs were taken to the Lund property under Mr. Oakley's direction and with his consent after they had already been severed from the Oakley land and made into logs by Mr. Oakley himself. The statutory remedy of treble damages applies when a person "cuts down, destroys or carries away any tree or trees placed or growing. ..or wood. . .belonging to another person, without leave from the owner of such trees, timber, wood. . ." 13 V.S.A. § 3606. This does not apply to the logs Mr. Oakley intentionally stored at the Lund property.

4. Punitive damages. Punitive damages may be awarded when a right to recovery of compensatory damages has been shown, and the court finds that an individual defendant or a managing agent of a corporation acted with actual malice. Actual malice is shown by conduct manifesting personal ill will, or carried out under circumstances evidencing insult or oppression, or conduct showing a reckless or wanton disregard of one's rights. In this case, there was a reckless or wanton disregard of the Oakleys' property rights when Mr. Lund directed the digging of a trench that was clearly at least partially located on the Oakley property. Mr. Lund was acting as the Superintendent of the project on behalf of VIJ, which had authorized the conduct. There could have been no question that the trench was being dug on Oakley land. During the same period, Mr. Lund on behalf of VIJ, and other members of VIJ, were being very friendly toward the Oakleys, including offering them help and equipment services for free, so there was no lack of opportunity to seek the Oakleys' consent. On behalf of VIJ, Mr. Lund as Superintendent of the water projects made the decision to recklessly and wantonly disregard the Oakleys' right to exclusive possession and use of their land without invasion. Punitive damages are authorized by law for such conduct where a right to recovery and compensatory damages have been proved. *Powers v. Judd,* 150 Vt. 290 (1988). The amount is within the discretion of the court. The court hereby awards punitive damages in the amount of $20,000.00.

Summary. Plaintiffs shall recover $13,001 in compensatory and $20,000 in punitive damages from VIJ for a total of $33,001, and $2,000 from David Lund personally.

10

The court has issued a separate Judgment pursuant to V.R.C.P. 58(a) in accordance with these Findings and Conclusions.

Dated at Chelsea, Vermont this 25th day of June, 2009.

_____
Mary Miles Teachout
Superior Court Judge

_____
Maurice Brown
Assistant Judge